### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | : | |
| KIMBERLY DOTY | : | |
| | : | |
| v. | : | Civil No. CCB-11-2008 |
| | : | |
| HARTFORD LIFE AND ACCIDENT | : | |
| INSURANCE COMPANY | : | |
| | : | |
| | : | |

### MEMORANDUM

Plaintiff Kimberly Doty brought this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, to appeal the denial of short-term disability benefits by her employer's insurer, defendant Hartford Life and Accident Insurance Company ("Hartford"). Now pending are cross-motions for summary judgment. The motions have been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the following reasons, the defendant's motion will be denied, the plaintiff's motion will be granted in part, and this case will be remanded to Hartford with instructions to perform a full and fair review of Ms. Doty's claim.

## I.  BACKGROUND

Ms. Doty was employed as a program director consultant for Computer Sciences Corporation ("CSC") from February 2008 until July 2010. During this time, she participated in the CSC Group Short Term Disability Plan (the "plan"), which is insured by defendant Hartford. (*See* ECF No. 12, at 1–50.) The plan provides benefits to participants who "become disabled

from a covered accident sickness or pregnancy," (*id.* at 5), and defines "disabled" in relevant part as "prevented . . . from performing the essential duties of your occupation, and as a result, . . . earning less than 20% of your pre-disability weekly earnings."   (*Id.* at 16.)   The terms "prevented," "essential duties," and "occupation" are not defined.   (*See id.* at 14–16.)   The plan reserves the right to have participants examined to determine if a disability exists, (*id.* at 13), and explicitly retains "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the . . . Policy."   (*Id.* at 14.)

The administrative record in this case contains no formal job description for Ms. Doty. In a letter to Hartford appealing the initial denial of benefits, however, Ms. Doty described the requirements of her job duties at CSC in the following way:

> While a portion of my job is performed in the seated position, a great many duties are not. . . . [M]y job requires me to carry my laptop and peripherals daily if not more frequently from client to client.  Through the course of a typical day I must carry my computer, work documents (books) and related work items from desk to conference rooms, to other secure and non-secure work locations and from the parking lot to my desk and then home.
>
> While at the client site I must walk from room to room to work with clients at their desk.  I must be able to walk great distances to remote locations at my client's facilities. I must be able to give presentations and project updates.
>
> I must be able to type and sit at the computer. . . .
>
> Overnight travel is required. . . . I am also required to carry my laptop and peripherals. It is not unusual to have to carry heavy books and/or document binders.
>
> I am required to drive to work . . . .
>
> Most importantly is my ability to think through and analyze complex data sets, manage and compile data, and resolve our clients' technology issues with creative and innovative solutions utilizing state of the art and leading edge technologies.
>
> I work with Top Secret documents and data.  I am exposed to critical and

2

sensitive data and must be able to apply full mental faculties to these problems.

(Dec. 13, 2010, Letter from Ms. Doty to Hartford, ECF No. 12, at 194–95.)


## A.  Injury and initial treatment

Ms. Doty, who is now 47 years old, has suffered from back pain for many years. Between 1999 and 2005 she underwent three laminectomies and discectomies, which are types of spinal surgery.  In 2007 she underwent a "total disc replacement at L4-5," after which "she was essentially pain-free" for a period of time.  (Dr. Faust Notes, Jan. 18, 2011, ECF No. 12, at 133.)  At some point in 2009, however, Ms. Doty again began to experience "radiating right leg pain with numbness and tingling on her lateral toes."  (Dr. Zigler Notes, Jan. 11, 2010, ECF No. 12, at 130.)  According to the doctor who had performed the disc replacement surgery, the new symptoms were "what sounds like right S1 radiculopathy," (*id.*), a disease or disorder of a spinal nerve root that can be caused by nerve compression from a herniated disk or other types of spinal cord injuries or spinal diseases.[1]

On November 4, 2009, shortly after the return of her pain symptoms, Ms. Doty was involved in a motor vehicle accident in which she was rear-ended by a construction truck.  (*Id.*; Dr. Lee Notes, Apr. 30, 2010, ECF No. 12, at 239.)  After the accident, Ms. Doty "experience[d] pain involving the right shoulder with radiation to the right elbow.  [She] noticed that she had weakness in her right hand, as well," and "noticed exacerbation of pre-existing low back pain with radiation of pain to the legs as well."  (Bay Area Neurology Notes, Apr. 13, 2010, ECF No. 12, at 166.)

---

[1] Hartford defines radiculopathy as a "pathological condition of the nerve roots," citing the website of the National Institutes of Health.  (Def.'s Mot. Summ. J. 2 n.2, ECF No. 14-2.)  *See* http://www.nlm.nih.gov/.

Ms. Doty continued to work for approximately nine months after the accident.  During that time she visited several physicians, whose notes are contained in the record.  The notes, summarized in part below, were considered by Hartford in their final decision on Ms. Doty's application for benefits.

- On January 11, 2010, Ms. Doty visited Dr. Jack Zigler, who had performed her 2007 surgery.  Dr. Zigler speculated that the pain could stem from a disc herniation related to her previous surgery, and he suggested an MRI.  (ECF No. 12, at 130, 239.)  The results of the MRI, however, were largely normal.[2]  Dr. Zigler concluded that the pain was not related to the replaced disc, (*id*. at 239), and that Ms. Doty's "lumbar spine does not appear to be the culprit." (*Id*. at 129.)  He advised Ms. Doty to see a neurologist.  (*Id*.)

- On April 13, 2010, Ms. Doty visited Bay Area Neurology and was seen by Dr. Larry Blum, who authorized electrodiagnostic testing, x-rays, and further MRI imaging.  (*Id*. at 167.)  The results of the cervical spine MRI were "normal" and "unremarkable," (*id*. at 220)[3], but the lumbar spine x-ray showed "mild degenerative disk narrowing at L5-S1." (*Id*. at 221.)  The diagnostic studies, carried out by Dr. John Lossing at Bay Area Neurology, noted a "delay in both median and ulnar F waves on the right compared to left [which] invites suspicion of demyelinating process for C8 nerve roots on the right."[4]  (*Id*. at 169.)  Finally, the report noted that "the patient has an absent right H-reflex," which "can correlate with S1 radiculopathy." (*Id*.)

- On April 30, 2010, at the suggestion of Dr. Blum, Ms. Doty visited Physical Medicine and Pain Management Associates to explore "nonsurgical care options." (*Id*. at 239.)  She was seen there by Dr. Thomas Lee, who noted her symptoms,[5] reviewed her file, and recommended holding off on physical therapy "because of likely intolerance." (*Id*. at 240.)  He gave Ms. Doty one or more trigger point injections in the area of her pain and planned to revisit the potential for further injections or physical therapy on a future visit.  (*Id*.)

---

[2] Dr. Lee's later summary of the same MRI, however, does describe a "mild increased T2 signal noted in the bilateral L5-S1 z-joint." (*Id*. at 240.)

[3] Dr. Lee's later summary of this cervical spine MRI, however, noted that it was "negative except for possible mild right C5-6 z-joint DJD." (*Id*. at 240.)

[4] According to defendant, "demyelination" is the term used for a loss of myelin, a substance in the white matter that insulates nerve endings. (Def.'s Mot. Summ. J 3 n.4, ECF No. 14-2.)

[5] Ms. Doty reported her pain to be a "7 out of 10."  Dr. Lee noted that "[a]ll activities can be aggravating including overhead activities." (ECF No. 12, at 239)  He noted that her "sleep is poor" and that lying "on her side is very difficult." (*Id*.)  He noted that "[a]ctive cervical and lumbar spine range of motion is 75% of normal in all planes with mild end range tenderness in extension in the cervical spine." (*Id*.)  He noted "[p]ainful arc, empty can, Neer's and modified Hawkins are positive on the right." (*Id*. at 240.)

- On June 7, 2010, Ms. Doty visited another provider, Advanced Pain Management. There, Dr. Damon Freas noted Ms. Doty's continued symptoms and that the "pain is made to feel worse by walking or lying down and it is made to feel better by sitting." (*Id.* at 136.) Dr. Freas noted that Dr. Lee's injections "helped arms but did not help her legs." (*Id.*) Dr. Freas's assessment listed three diagnoses, "1. Lumbosacral spondylosis, 2. Lumbar degenerative disc disease, 3. Myofascial pain." (*Id.*) He prescribed the painkiller Lyrica.

Ms. Doty's last day of work at CSC was July 13, 2010, after which she continued treatment while on a leave of absence. (*See* Nov. 30 Denial of Benefits Letter, ECF No. 12, at 275; Sept. 13, 2010, CSC Email Regarding Leave, ECF No. 12, at 58).[6]

- On July 27, 2010, Ms. Doty returned to Advanced Pain Management, where she complained of severe spasms. Physician's Assistant Earle Grey switched Ms. Doty's drug regimen. She had been taking Cymbalta, a drug used to treat fibromyalgia, and Skelaxin, a muscle relaxant. After the visit, Ms. Doty was started on Savella, another drug used to treat fibromyalgia, and Cymbalta was discontinued. (ECF No. 12, at 275.) As discussed below, during this visit P.A. Grey appears to have filled out a form application for short term disability benefits that Ms. Doty later turned in to Hartford.

- On August 3, 2010, Ms. Doty again visited Dr. Blum. Her symptoms at that point appear to have worsened. Dr. Blum noted that Ms. Doty complained that "she is still, unfortunately, experiencing significant pain in the back with spasms involving both the low back, legs and, to some extent, her jaw. She is taking Valium with the spasms. The back is worse than the leg as well." (*Id.* at 182–83.) Dr. Blum noted that Ms. Doty's "gait is antalgic," meaning that she was walking with a limp to avoid pain on weight-bearing structures. (*Id.* at 182.) Dr. Blum's impression was that Ms. Doty "has significant low back pain," and that injections for pain relief "should be continued." (*Id.* at 183.)

- On August 16, 2010, Ms. Doty was prescribed Hydrocodone for pain and an MRI was scheduled for her shoulder. (*Id.* at 276.)

- On August 17, 2010, Ms. Doty visited Advanced Pain Management again. In her file, P.A. Grey noted: "Patient to be re-eval. on 9/13/10 for return to work status. Patient to remain off work until then." (*Id.* at 197.)

---

[6] From Ms. Doty's STD claim form it appears that she was paid through sick pay and vacation pay until August 6, 2010, after which she began an unpaid leave of absence. (*See* ECF No. 12, at 73.)

- On August 18, 2010, MRI results indicated a "small partial tear superior aspect of the subscapularis tendon [in her right shoulder] and supraspinatus tendinopathy." (*Id.* at 276.)

### B. Application for benefits and continued treatment

In late August 2010, Ms. Doty filed for short term disability benefits under the Hartford plan.  In addition to the attending physician section of the application form dated August 23, 2010, she also attached an Attending Physician's Statement ("APS") form dated July 27, 2010.  Both documents were signed by P.A. Grey, from Advanced Pain Management.   On the application form, P.A. Grey listed the injury as resulting from the car accident and the expected return to work date as "unknown."  (*Id.* at 75.)  Where the application form asked him to "list all restrictions that currently prevent a return to work," P.A. Grey wrote the words "not cleared yet before."  (*Id.*)

The APS noted diagnoses of lumbar post laminectomy syndrome, lumbago, lumbar spasm, and cervical and lumbar myalgia.  (*Id.* at 198.)  P.A. Grey noted Ms. Doty's subjective symptoms of neck pain, lower back pain and spasm.  In the "progress" section of the form, P.A. Grey marked the box for "retrogressed."  (*Id.*)  In response to the question asking about the patient's current physical limitation and restrictions, P.A. Grey checked the box for "moderate limitation of functional capacity."  (*Id.*)  This limitation is defined on the APS form as "capable of clerical/administrative (sedentary) activity (Lifting 10lbs maximum and occasionally lifting and/or carrying articles.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.)"  (*Id.*)[7]

---

[7] The other relevant and *unchecked* boxes were for "slight limitation" and "severe limitation."  These two categories were defined in the following manner:
Slight limitation of functional capacity; capable of light work.  Lifting 20 lbs. maximum with

After filing her application for disability benefits, Ms. Doty continued her treatment. On September 7, 2010, she received an injection for pain in her right shoulder from Dr. George Lantz at Advanced Pain Management, and she began physical therapy in early October 2010. On October 6, 2010, Ms. Doty was seen by Joshua Bigelow, a Doctor of Physical Therapy at Advanced Pain Management. Mr. Bigelow's file notes include a "Disabilities of the Arm, Shoulder and Hand" ("DASH") questionnaire that Ms. Doty appears to have filled out. (*Id.* at 199–202.) In his summary of her visit, Mr. Bigelow noted that Ms. Doty has "significant impairments with bending her neck, turning her neck, driving, getting up from a chair, and any kind of daily regimen as far as grooming and dressing herself." (*Id.* at 204.) Mr. Bigelow determined that Ms. Doty "would benefit from skilled [physical therapy] intervention to improve pain symptoms and return to work." (*Id.* at 205.) According to Dr. Bigelow, Ms. Doty "has good potential for rehab and would benefit from two to three times a week for 10 weeks and progress to an extensive home exercise regimen." (*Id.*)

On November 2, 2010, Ms. Doty underwent a lumbar epidural. And on November 3, 2010, she returned to Bay Area Neurology. On that visit, Dr. Blum and Physician Assistant Brian Walker recorded "[a] complete neurological exam including mental status, cranial nerves, deep tendon reflexes, motor, sensory and cerebellar" and noted that all were "nonfocal with the exception of the following: Her gait is cautious and antalgic, however, is unaided." (*Id.* at 185.)

---

frequent lifting and/or carrying of objects weighing up to 10 lbs. Even though the weight lifted may be only a negligible amount, a job is in this category when it involves sitting most of the time with a degree of pushing and pulling of arm and/or leg controls, or when it requires walking or standing to a significant degree.)
. . .
Severe limitation of functional capacity; incapable of minimal (sedentary) activity
(*Id.* at 198.)

Dr. Blum and P.A. Walker concluded that "she does seem to have a component of fibromyalgia" and that "[g]reater than 50% of today's visit was spent counseling the patient." (*Id.*)

On December 22, 2010, Ms. Doty visited Dr. Titus Abraham, of Annapolis Internal Medicine. Dr. Abraham gave Ms. Doty a physical exam which was largely normal, though he noted that her right shoulder was "tender laterally." (*Id.* at 159.) He noted that it "appears that injections have not helped" and that, among other medications, Ms. Doty was still taking Hydrocodone, Valium, and Savella. According to his notes, Ms. Doty "is interested in getting off her meds since it does interfere with her thinking sometimes and prevents her from working at her job." (*Id.*)

The final notes in the administrative record are from January 18, 2011, when Ms. Doty visited Dr. Stephen Faust at Orthopaedic and Sports Medicine Center. Dr. Faust noted that Ms. Doty's pain has been "progressively increasing" after the car accident and that she "now rates [it] as 8 on a 1-10 scale." (*Id.* at 133.) She noted that she reports "diffuse weakness with the tendency of her knees to buckle and her feet to drag." (*Id.*) Dr. Faust noted that her symptoms were positive for fibromyalgia and that she "has pain in other joints," but that "[a]ll other systems were reviewed and are negative." (*Id.*) Dr. Faust included in his examination notes a comprehensive list of Ms. Doty's current medications.[8] In the recommendation section, he noted that he "told Ms. Doty that frankly I do not see a surgical target and would not recommend further surgery. I know that is not what she wants to hear . . . ." (*Id.* at 134.)

---

[8] In addition to drugs related to Ms. Doty's thyroid problem, Dr. Faust noted that "[t]he patient currently takes Cymbalta 30 rng three times daily, . . . Hydrocodone l0-325 three to four times daily, Diazepam [Valium] three to four times daily, . . . Voltaren Gel four times daily, Lidoderm patch three patches at night." (*Id.* at 133.)

### C.  Denial of benefits

Hartford denied Ms. Doty's application in November 2010 and later denied her appeal in April 2011.  Prior to the initial denial, Hartford reached out to P.A. Grey and requested additional information supporting his limitation on her activity.  In the letter, Hartford alleged that Ms. Doty's "physical exams were essentially normal except for self reported pain and spasms, which does not necessarily cause a loss of function."  (ECF No. 12, at 283.)  According to Hartford, P.A. Grey did not respond, but shortly thereafter Hartford received a short letter from a nurse at Advanced Pain Management, Anneliese Greksa, addressed "To Whom It May Concern."  (*Id*. at 144.)  The letter stated:

> Kimberly has been a patient in this office since June 7, 2010.  She comes in with lumbar postlaminectomy syndrome, low back pain, questionable right hand RSD, and right shoulder injury. At this time, she currently needs to take narcotics to help control her pain, so she is unable to work at this time. She is currently getting injections and day PT so that in the near future she can get back to work.

(*Id*.)  In a phone call with Ms. Doty on October 13, 2010, a Hartford examiner asked her what part of her job could she not perform.  The call notes list her answer as "Due to high clearance levels at job, no mind altering drugs."  (*Id.* at 98.)  In Hartford's internal electronic claim file system, examiners expressed skepticism of Ms. Doty's claim, noting that "taking narcotics do not necessarily indicate a loss of function and may be taken at night w/ an NSAID during the day."  (*Id.* at 92–93.)

Hartford communicated the initial denial in two separate letters to Ms. Doty.  The first letter, dated November 8, 2010, advised her of a denial determination based on "lack of sufficient proof of loss required to enable us to evaluate your Disability."  (*Id.* at 281.)  The letter listed the plan provisions that applied to Ms. Doty's claim and stated, in relevant part, "We

acknowledge your self reported symptoms of pain.  However, we did not receive any objective findings to support your complaints of pain." (*Id.* at 280.)  The letter specifically noted that Dr. Freas had not yet sent notes from her visit, and that it would be helpful for Hartford to review notes from Ms. Doty's physical therapy sessions.

On November 30, 2010, Hartford forwarded a second letter to Ms. Doty, incorporating the November 8, 2010, letter and summarizing all of the information on which it relied, including the notes from Dr. Freas that had been received after the first letter had been sent.  (*Id.* at 275.) The November 30, 2010, letter noted that Hartford had sent a fax to Advanced Pain Management "to clarify" Ms. Doty's functionality and to date had not received a response.  The second denial letter reiterated much of the language from the first letter, noted that "the pain felt better with sitting," and concluded that "the information provided does not support your inability to perform your job duties and we cannot honor your claim." (*Id.* at 276.)  The letter included instructions on how to file an administrative appeal of the denial.

On December 13, 2010, Ms. Doty appealed Hartford's decision.  In a letter advising Hartford of her appeal, Ms. Doty included the description of her job requirements, listing several she could not meet:

> I must be able to type and sit at the computer.  (My husband is actually typing this for me as I am not able to type and sit in front of the computer for long periods of time.).

> Overnight travel is required.  I cannot lift suitcases. . . .

> I am required to drive to work which should not and legally cannot be done under the effect of my medications . . . .

> I work with top secret documents and data.  I am exposed to critical and sensitive data and must be able to apply full mental faculties to these problems.

I must attend security briefings and must comply with security guidelines to protect Government Top Secret data. Being heavily medicated puts me at risk and of [sic] failing to identify or defend security breaches.

. . .

Regardless of the doctors ability to identify the specific cause of my debilitating pain they have medically concluded that I should not be at work and could not perform my duties of employment with CSC as evidenced by the attached stay out of work orders.

(*Id.* at 194–95.)

As part of the review of Ms. Doty's appeal, Hartford referred Ms. Doty's case file to Dr. Michael Errico, a Board Certified Orthopedic Surgeon. Dr. Errico reviewed all of the medical records summarized above and submitted a report to Hartford. As part of his review, Dr. Errico attempted without success to contact Dr. Blum and Dr. Lossing over the course of a week. He was, however, able to briefly speak to Dr. Lantz at Advanced Pain Management. Dr. Lantz confirmed that he had given Ms. Doty an injection in her shoulder and that he believed there had been no further shoulder complaints after the injection. He directed Dr. Errico to speak to Ms. Greksa, the nurse at Advanced Pain Management. Dr. Errico summarized his conversation with Ms. Greksa in the report:

[Ms. Greksa] explained to me that she sees the claimant on a once-a-month basis and essentially gives her medications. . . . I asked her what if anything she knew that prevented Ms. Doty from working from the period of 7/14/10 on. She said she knew of nothing that prevented her from doing that. I asked her what evidence there was for the inability to sit, stand, walk, reach, lift, etc., and she said there was no such evidence. I asked her what relieved the alleged symptoms, she said nothing, and I asked what specific activities exacerbate or precipitated worsening of her symptoms, and she said none. Ms. Gretska [sic] also stated that she felt that the claimant's self-reported symptoms are not supported by the medical evidence that has so far been accumulated.

(*Id.* at 114.) After noting this conversation and summarizing the medical records from Ms.

Doty's other providers, Dr. Errico concluded that "there are no clinical findings to substantiate [her self-reported] complaints."  (*Id.* at 117.)  He continued, noting that "[r]egarding functional ability, there is no clinical evidence that documents and supports any restrictions or limitations on the claimants' functional ability from July 2010 onward." (*Id.* at 117–18.)  The report ends with the following colloquy:

> *5. Based on your conversation with Dr. Blum, Dr. Lossing, and Dr. Lantz, and review of the medical records, what restrictions do you feel are appropriate for the period beginning 7/14/10?  Please be specific with regard to the ability to sit, stand, walk, reach, lift, finger, etc.  Please also provide an approximate duration and rationale for any listed restrictions.*
>
> Based on the conversation specifically with Dr. Lantz and from my review of the medical records, there is no clinical evidence that documents and supports any restrictions or limitations on the above-noted activities from the period beginning 7/14/10 onward.

(ECF No. 12, at 118.)

On April 22, 2011, Hartford sent Ms. Doty a letter denying her appeal.  (*See* ECF No. 12, at 251–54.)  The letter noted the importance of Dr. Errico's report.  Prior to the report, Hartford stated, "it remained unclear" whether Ms. Doty met the policy definition of disabled.  (*Id.* at 252.)  After the review, however, Hartford concluded that Ms. Doty did not meet the definition. In relevant part, the letter read:

> Although it appears that you are experiencing some residual pain symptoms associated with your motor vehicle accident on November 4, 2009 and prior history of multiple back surgeries, the totality of evidence contained in the claim file does not support that your symptoms were to such a severity that would have precluded you from performing the essential duties of a sedentary to light occupation for the period beginning July 14, 2010.
>
> Your letter of appeal seems to center around a decreased cognitive ability due to the use of pain medications. Review of the medical information on file does not indicate that you are experiencing any decreased cognitive abilities or decreased mental function. Therefore, there is a lack of evidence to support a decreased

cognitive ability based on review of the medical information contained in your claim file.

The indication that your occupation is heavier than a sedentary level may be correct as it appears that you would need to travel to visit clients and carry appropriate materials to and from these various locations. It appears reasonable that your own occupation would be consistent with a light level occupation requiring periods of standing, walking, travel, and lifting. However, based on review of the claim file, the medical evidence does not support that you would be prevented from performing the essential duties of a light occupation. Therefore, the indication that your own occupational demands are higher than a sedentary level occupation does not change the outcome of our review.

(*Id.* at 253.)

Having exhausted her administrative remedies, Ms. Doty filed the instant suit on July 21, 2011.  On November 22, 2011, Hartford filed under seal with the court the administrative record on which it based its final determination of benefits.  The parties subsequently filed cross-motions for summary judgment based on this record.  Ms. Doty argues that summary judgment should be granted because the denial of benefits was an abuse of discretion by Hartford.  In the alternative, she argues that the case should be remanded to Hartford for a new review because of alleged failure to comply with ERISA's appeal and notice requirements in the initial denial of her claim.  Hartford argues that its denial of benefits should be upheld by this court and Ms. Doty's motion should be denied.  Ms. Doty and Hartford filed response briefs on January 20, 2012, and February 9, 2012, respectively.


### III. DISCUSSION

Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c)(2).  The Supreme Court has clarified that this does not

mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides

that the mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no

*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)

(emphasis in original).  Whether a fact is material depends upon the substantive law. *See id.*

"When both parties file motions for summary judgment, the court applies the same standards of

review." *Loginter S.A. Y Parque Indus. Agua Profunda S.A. Ute v. M/V NOBILITY*, 177 F. Supp.

2d 411, 414 (D. Md. 2001) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir.

1991)).


## A.  Wrongful denial of benefits

ERISA authorizes individuals to bring an action in federal court for wrongful denial of

insurance benefits.  29 U.S.C. § 1132(a)(1)(B).  Where, as here, the ERISA plan confers

discretionary authority on the plan administrator, the court reviews the administrator's decision

under an abuse-of-discretion standard. *See Johannssen v. Dist. No. 1–Pac. Coast Dist., MEBA*

*Pension Plan*, 292 F.3d 159, 168 (4th Cir. 2002) (citing *Feder v. The Paul Revere Life Ins. Co.*,

228 F.3d 518, 522 (4th Cir. 2000)).  Under this standard, an administrator's "discretionary

decision will not be disturbed if reasonable, even if the court itself would have reached a

different conclusion." *Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004) (quoting

*Booth v. WalMart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 341 (4th Cir.

2000)).

14

A denial of benefits will be considered reasonable and will not be overturned under the abuse of discretion standard if the decision "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Evans v. Eaton Corp. Long Term Disability Plan,* 514 F.3d 315, 322 (4th Cir. 2008) (quoting *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995)). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion," *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011) (quoting *LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir. 1984)), and "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance," *LeFebre*, 747 F.2d at 208 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

The Fourth Circuit has identified eight nonexclusive factors that may be considered by courts in determining whether an abuse of discretion occurred:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 359 (4th Cir. 2008) (quoting *Booth*, 201 F.3d at 342–43). A plan administrator has a "structural conflict of interest" where, as here, the administrator is "responsible for both evaluating and paying claims." *DuPerry*, 632 F.3d at 869–70 (4th Cir. 2011) (citing *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 632 (4th Cir. 2010)).[9]

---

[9] Prior to the Supreme Court's decision in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), the Fourth Circuit applied a "modified abuse-of-discretion" standard under which courts "afford less deference to the administrator's decision" where there was a conflict of interest. *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir.

In the instant case, the most relevant factors are whether the decisionmaking process was reasoned and principled, the adequacy of the materials considered and the degree to which they support the decision, and the administrator's admitted conflict of interest.

Ms. Doty argues that Hartford did not apply a reasoned and principled decisionmaking process because the determination relied too heavily on a flawed "file review" and disregarded the opinions of her treating providers. She argues that Hartford cannot reasonably rely on Dr. Errico's report because, she alleges, Dr. Errico either was not given or did not consider significant portions of the administrative record—in particular her self-reported job responsibilities, the notes from her physical therapy visit with Mr. Bigelow, and Dr. Faust's inventory of her prescription drug regimen. Finally, she argues that Harford's decision not to request an in-person examination should weigh against the reasonableness of its determination.

The court agrees with Ms. Doty that Hartford did not engage in a reasoned and principled decisionmaking process. To Hartford's credit, the company did spend nearly eight months contacting Ms. Doty's providers and analyzing the relevant information. (*See* Summary Detail Report, ECF No. 12, at 79–103.) And, during the appeals process, Hartford acknowledged that further information from CSC and from other providers might substantiate her claim of disability. After receiving further information, Hartford acknowledged that it remained unclear whether Ms. Doty met the definition for total disability and then hired a board-certified orthopedic surgeon for an independent medical records review. Dr. Errico's report, however, did not address Ms. Doty's central argument in her appeal—that the side effects of her medications prevented her from working. Nonetheless, in its final denial of Ms. Doty's claim, Hartford relied

2011) (quoting *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997)). "In *Glenn*, however, the Supreme Court clarified that the presence of such a conflict does not alter the applicable standard of review, but rather is 'but one factor among many that a reviewing judge must take into account.'" *Id.* at 869 (quoting *Glenn*, 554 U.S. at 116).

on Dr. Errico's report, did not properly consider statements by her treating providers that supported her claim of decreased cognitive abilities, and did not otherwise base its denial of benefits on substantial evidence.

In the denial of Ms. Doty's appeal, Hartford specifically summarizes Ms. Doty's appeal letter and noted that the letter "seems to center around a decreased cognitive ability due to the use of pain medications." (*Id.* at 253.) In discussing the process used to reach the final conclusion, Hartford stated that as of March 15, 2011, and after a review of her medical records, "it remained unclear" if she met the policy definition of disabled. (*Id.* at 252.) "As such, in order to assist with the review of the claim on appeal, [the] claim was referred to undergo an independent medical records review." (*Id.*) It appears, therefore, that Dr. Errico's report was necessary to Hartford's ultimate decision to deny Ms. Doty's claim.

Ms. Doty acknowledges that courts have routinely approved of a fiduciary's use of non-treating, non-examining physicians' opinions in reaching an eligibility determination. *See, e.g., Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 233–34 (4th Cir. 1997). She also acknowledges that ERISA plan administrators are not required to give special deference to the opinions of treating physicians. *See Evans*, 514 F.3d at 324–25 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). In *Evans*, for example, even though the plaintiff's examining physicians concluded she was disabled, the plan administrator denied benefits to the plaintiff based on the reports of nine reviewing physicians who "all agreed that she did not meet the definition." *Id.* at 323. The Fourth Circuit found that the reviewing physicians' reports "show every sign of reasoned judgment and good faith," *id.*, and amounted to substantial evidence, *id.* at 324. Therefore, the panel concluded, the plan administrator had not abused its discretion in denying

17

the benefits.

Ms. Doty argues, however, that reliance on a reviewing physician's conclusions may rise to the level of an abuse of discretion where the reviewer was not provided with or did not consider all the relevant evidence in the record.  By regulation, "[a] plan administrator has a duty to conduct a full and fair review of benefit applications 'that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim.'" *Evans v. Metro. Life Ins. Co.*, 358 F.3d 307, 315 (4th Cir. 2004) (Williams, J., concurring) (quoting 29 C.F.R. § 2560.503-1(h)(2)(iv) (2003)).  As the Supreme Court has held, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Williams*, 609 F.3d at 634 (quoting *Black & Decker*, 538 U.S. at 834.  Thus, a plan's reliance on a *report* that disregards reliable evidence may rise to the level of an abuse of discretion.  *See Donovan v. Eaton Corp., Long Term Disability Plan*, 462 F.3d 321, 328–29 (4th Cir. 2006) (finding abuse of discretion where reviewing report and final plan determination did not acknowledge existence of new evidence contradicting the prior diagnosis).

The court agrees with Ms. Doty that Dr. Errico's report does not provide substantial evidence, at least as to her claim that medication side effects prevented her from working.  The report does contain several pages summarizing the medical notes and diagnostic tests in the record.  This summary, however, is largely devoid of any analysis, and appears in some places to selectively quote language supporting Dr. Errico's ultimate conclusion.  For example, Dr. Errico does not mention the findings of the electrodiagnostics studies that showed a "delay in both median and ulnar F waves on the right compared to left [which] invites suspicion of

18

demyelinating process for C8 nerve roots on the right," as well as "an absent right H-reflex" which "can correlate with S1 radiculopathy."  (*Id.* at 169.)  Nor does he make any mention of fibromyalgia, even though several of her physicians list the disease as a diagnosis or as part of her medical history.  (ECF No. 12, at 133, 159, 185.)[10]

More problematic, however, is the fact that Dr. Errico's report nowhere acknowledged having reviewed the specific job requirements that Ms. Doty submitted with her appeal—and in particular the cognitive requirements that she alleges she cannot meet while taking her prescribed medications.  At least in some circumstances, where a reviewing physician does not discuss a plaintiff's job duties, it may be inferred that "he did not conduct a reasoned evaluation of her condition to determine whether she could perform those duties."  *Elliot v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 619 (6th Cir. 2006).  Here Dr. Errico never expressly noted Ms. Doty's job duties and does not expressly state that she is capable of light duty work.  Neither does he discuss her allegation that prescribed medications prevent her from working.  The specificity of Dr. Errico's conclusions is limited to the colloquy in which he stated that there was no clinical evidence to support any restrictions or limitations on "the above-noted activities" – referring to the "the ability to sit, stand, walk, reach, lift, finger, etc."  (*Id.* at 118.)  There is no indication whether this conclusion assumes Ms. Doty's use of her prescribed medications or not.  And Hartford does not appear to have asked Dr. Errico whether Ms. Doty's medications would interfere with her cognitive abilities.  As a result, Hartford cannot reasonably rely on Dr. Errico's

---

[10] Ms. Doty also argues that Dr. Errico did not give any indication of having reviewed Mr. Bigelow's notes, including the DASH questionnaire.  While Dr. Errico's report does not mention Mr. Bigelow by name, it does include a summary of Ms. Doty's October 6, 2010, visit with him where she "was complaining of increased low back pain and right shoulder pain" and where "[p]hysical therapy was recommended."  (*Id.* at 116.)  Dr. Errico further stated that "[s]ignificant positive neurological findings are not present in the objective findings section" of Mr. Bigelow's notes.  He does not, however, note Mr. Bigelow's conclusions that Ms. Doty had "significant impairments with bending her neck, turning her neck, driving, getting up from a chair, and any kind of daily regimen as far as grooming and dressing herself."  (*Id.* at 204.)

report for the proposition that Ms. Doty's medications do not prevent her from performing her job.

Hartford's argument therefore rests on its conclusion that Ms. Doty simply lacks any evidence of cognitive decreased cognitive abilities.   In its motion for summary judgment, Hartford notes that "Dr. Blum conducted complete neurological evaluations in April, August, and November 2010 and found no evidence of any cognitive or other neurological issue." (Def.'s Mot. Summ. J. 21.)   Hartford also notes that Dr. Faust listed all of Ms. Doty's medications in January 2011 without mentioning any concerns about side effects.   Finally, Hartford argues that it is not an abuse of discretion to deny coverage because of a lack of evidence in the record supporting decreased cognitive ability.

To support this argument, Hartford cites two unreported cases from outside of this district, *Nicely v. Unum Life Ins. Co.*, Civ. No. 08-509, 2009 WL 5201852 (M.D.N.C. Dec. 23, 2009) (recommendation of magistrate judge), and *Day v. Hartford Life Ins. Co.*, Civ. No. 09-1041, 2009 WL 3617549 (D.S.C. Nov. 2, 2009).   In these two cases, however, coverage was denied based on records significantly different from the record in this case.   In *Nicely*, coverage was denied based on a report by a clinical neuropsychologist employed by the insurance company.   The neuropsychologist extensively addressed the complaints of medication side effects, and the court held therefore that the insurance company's decision "simply came down to a permissible judgment call between conflicting medical opinions." 2009 WL 5201852 at *11. Similarly, in *Day*, two separate independent reviews specifically addressed the complaints of cognitive side effects and concluded they had no basis.   2009 WL 3617549 at *6.   And "on numerous occasions" the plaintiff's treating physician had "specifically indicated that [she]

experienced 'no side effects' from her medication." *Id.* at *9.   In Ms. Doty's case, in contrast, there was no independent review of the question of medication side effects and Hartford does not and cannot argue that the decision is simply a judgment call between conflicting medical opinions.

Though the lack of a reliable independent review distinguishes Ms. Doty's case, Hartford's decision-making process suffered from additional problems as well.   In addition to relying on a defective independent review, Hartford failed to acknowledge evidence supporting Ms. Doty's claim.   The only discussion of Ms. Doty's complaints about her medications in Hartford's three separate denial letters is a single conclusory statement that "[r]eview of the medical information on file does not indicate that you are experiencing any decreased cognitive abilities or decreased mental function." (*Id.* at 253.)

As Ms. Doty points out, the record contains significant evidence of her drug regimen.  As early as June 7, 2010, there are references in the record to drug prescriptions.   In its November 30, 2010, denial letter, Hartford noted the drug regimen decisions made on July 27, 2010, including the discontinuance of Cymbalta and the prescription for Savella.   On August 3, 2010, it was noted that Ms. Doty was taking Valium for her spasms.   And on August 16, 2010, she was prescribed Hydrocodone.   Both Dr. Abraham and Dr. Faust include in their notes her exact drug regimen.   Dr. Abraham's December 22, 2010, notes include the milligram amounts and number of doses per day of drugs for Ms. Doty's unrelated thyroid problem, as well as Hydrocodone, Valium, Savella, and two topical anti-inflammatory and anesthetic drugs for her pain symptoms. (ECF No. 12, at 149.)  Dr. Faust's notes contain a similar list, though with Cymbalta instead of Savella, and without the milligram amounts.  (*Id.* at 133.)

The record also contains four references to concerns about cognitive side effects expressed by Ms. Doty or her providers: (1) The October 6, 2010, letter from Ms. Greksa stating that [a]t this time, [Ms. Doty] currently needs to take narcotics to help control her pain, so she is unable to work at this time," (*id.* at 144); (2) Ms. Doty's October 13, 2010, phone call with a Hartford examiner where she stated that the part of her job she could not perform was "Due to high clearance levels at job, no mind altering drugs," (*id.* at 98); (3) Ms. Doty's December 13, 2010, appeal letter where she noted that she cannot drive under the effect of the medications and "[b]eing heavily medicated puts me at risk and of failing to identify or defend security breaches" (*id.* at 195); and (4) the notes from her internist, Dr. Abraham, in which he stated that "[s]he is interested in getting off her meds since it does interfere with her thinking sometimes and prevents her from working at her job." (*Id.* at 159.)

Aside from its acknowledgement of Ms. Doty's appeal, Hartford failed to mention or address any of these statements in its denial letters.  Hartford makes no reference at all to Dr. Abraham's statement.  And the reference to Ms. Greksa's letter conveniently includes only "You need narcotics to help control the pain," (*id.* at 276), leaving out the second half of Ms. Greksa's statement that connects Ms. Doty's medication to her inability to work.  (*Id.* at 144.)  Hartford now complains that Ms. Greksa "did not identify any evidence supporting the sweeping conclusion that simply because the Plaintiff was taking narcotic medications she was unable to work."  (Def.'s Mot. Summ. J. 6.)  The court might be more receptive to this argument had Hartford included it as part of its denial determination.  But given that the cautionary phrasing of Ms. Greksa's statement was edited out in Hartford's November 30 summary, there is no

evidence that the statement was properly considered when the determination was made.[11]   The

failure to acknowledge the contrary statements of treating providers indicates an abuse of

discretion.  *Black & Decker*, 538 U.S. at 834.

It may be that the evidence put forth by Ms. Doty is insufficient to overcome the

reasoned opinion of an independent medical professional.  It is true that she has not included in

the record any affidavit from her physicians discussing the specific effects of the dosage levels

she was taking or from her employer to confirm that she could not perform her job while taking a

combination of Valium, Hydrocodone, and other drugs.   Neither has she undergone any

diagnostic testing to determine the cognitive effects of the medications.  Nonetheless, Ms. Doty

raised the issue of medication side effects both before the initial denial and in her letter of appeal.

*Cf. DiCamillo v. Liberty Life Assurance Co.*, 287 F. Supp. 2d 616, 625 (D. Md. 2003) (finding no

abuse of discretion where plaintiff never mentioned concerns about medication side effects to her

providers and the claim was not originally focused on the issue).   Ms. Doty has provided the

statements of two medical professionals who stated that the medications prevent her from

working.   And through Dr. Abraham's notes, she provided the exact dosage amounts that she

was taking.   Hartford acknowledged only her appeal letter and offered nothing in its denial of

benefits to explain the conclusory statement that the medical record was insufficient.   The court

therefore cannot find that Hartford followed a reasoned decisionmaking process or presented

---

[11] Hartford does not explicitly suggest that Ms. Greksa's alleged later statement to Dr. Errico is relevant to the discussion of her medication side effects.  But, even if they had so suggested, this statement could not be considered to be more than a scintilla of evidence supporting denial of benefits.  According to the report, Ms. Greksa stated that she "knew of nothing that prevented" Ms. Doty "from working from the period of 7/14/10 on."   (*Id.*)   That statement, however, is not purported to be an exact quotation, and there is no evidence that medication side-effects or the cognitive requirements of Ms. Doty's job were discussed.  Furthermore, Dr. Errico's report of Ms. Greksa's statement is an example of double (if not triple) hearsay, and therefore cannot be credited in the same way as a statement made directly in the record by a medical provider.

substantial evidence to support its determination on the question of medication side effects.[12]

Given the finding that Hartford did not engage in a reasoned and principled decisionmaking process and did not support its determination with substantial evidence, the court need not consider the conflict-of-interest factor in order to conclude that Hartford abused its discretion. See *Champion*, 550 F.3d at 362 (noting that the conflict-of-interest factor may "act[] as a tiebreaker when the other factors are closely balanced" (quoting *Glenn*, 554 U.S. at 117)). Nonetheless, the court notes that the particular circumstances of this case do merit according some weight to Hartford's admitted conflict of interest. *See DuPerry*, 632 F.3d at 873-74 (4th Cir. 2011) (finding abuse of discretion "[e]specially in light of the structural conflict of interest" where defendants relied on a defective independent review and otherwise did not provide substantial evidence to counter, among other complaints, concerns about side effects of medications). Thus, the court concludes that Hartford did not adequately address the claim that the side effects of Ms. Doty's medications prevented her from working, and the admitted conflict of interest further confirms that the denial of benefits amounted to an abuse of discretion.

## B.  Appropriate Remedy

When a plan administrator has abused its discretion, a district court may either reverse the decision or remand it to the administrator for further review. *See DuPerry*, 632 F.3d at 875–76; *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999). While "'remand should be used sparingly,' . . . [it] is most appropriate 'where the plan itself commits the trustees to consider relevant information which they failed to consider or where [the] decision involves records that

---

[12] There is no need to reach the question of whether it is relevant that the Hartford plan included terms requiring participants to submit to an in-person physical examination if requested.  (Pl.'s Mot. Summ. J. 15–16.)

were readily available and records that trustees had agreed that they would verify.'" *Elliott*, 190 F.3d at 609 (quoting *Berry v. Ciba-Geigy Corp.*, 761 F.2d 1003, 1008 (4th Cir.1985)).  Remand is not appropriate where a "clear and positive" showing is made that further exhaustion of administrative remedies would be futile.  *DuPerry*, 632 F.3d at 875–76 (quoting *Makar v. Health Care Corp. of Mid–Atl. (CareFirst)*, 872 F.2d 80, 83 (4th Cir. 1989)).  In the latter case, a court may simply decide to award benefits to a claimant instead of remanding the case.  *Id.* at 876.

Remand is appropriate in this case to afford Hartford the opportunity to conduct a full and fair review of Ms. Doty's condition, giving the proper attention to her complaints about the secondary effects of her drug regimen and the intellectual demands of her job.  *See Laser v. Provident Life & Acc. Ins. Co.*, 211 F. Supp. 2d 645, 657 (D. Md. 2002) (remanding case where plan administrator failed to conduct an independent review and otherwise did not rely on substantial evidence); *Dunbar v. Orbital Sciences Corp. Group Disability Plan*, 265 F. Supp. 2d 572, 588–89 (D. Md. 2003) (same).  The court here does not find that a clear and positive showing has been made such that a remand would necessarily be futile.  As discussed above, the court does not go so far as to find that Ms. Doty has provided evidence sufficient to overcome a properly-conducted independent review or an otherwise full and fair review.  Accordingly, remand is the appropriate remedy, and the court thus need not consider plaintiff's additional arguments about ERISA's appeal and notice requirements.


## IV. <u>CONCLUSION</u>

For all of the reasons discussed above, defendant's motion will be denied, plaintiff's motion will be granted, and this case will be remanded to Hartford for further administrative

proceedings.

A separate order follows.


_____July 27, 2012_____                    _____/s/_____
Date                                         Catherine C. Blake
                                             United States District Judge